[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This action was commenced by Waterbury Landfill Associates to foreclose a mechanics lien filed upon the property of The Eastern Company. Pursuant to General Statutes § 49-37 a bond was substituted for the lien, in the amount of $45,000, with The Eastern Company as principal and Aetna Casualty and Surety Company as surety. Hence this action proceeds on the bond which was given in substitution of the lien.
The facts are as follows. The Eastern Company owned property on Bridge Street in the Town of Naugatuck, Connecticut. The property included a foundry complex consisting of old CT Page 1730 buildings constructed of concrete and brick and wooden beams varying in height from one to three stories. The company had been attempting to sell the property for a year and a half prior to the events described herein, with no success. It was therefore determined that it would be best to, most economical, to demolish the buildings and sell the land unencumbered by these old buildings.
In the spring of 1993 this decision to demolish was made. There is nothing to indicate that The Eastern Company had any prior experience concerning building demolition. A Mr. John Pelloquin submitted a proposal to do the entire work of demolition and debris removal for a total contract price of $180,000. Mr. Donald Whitmore, vice-president, secretary and principal financial officer determined this to be a competitive price. Mr. Pelloquin had done some interim clean-up work for The Eastern Company and had accomplished that work in a satisfactory fashion. There is no evidence to indicate whether Mr. Pelloquin had previous experience with demolition work of this scale, or for that matter whether he had any significant experience with demolition work in general.
On May 9, 1993 The Eastern Company, acting by Mr. Whitmore, V/P Treas., signed the contract for this work. The contract was executed on a proposal form captioned "John Paul Ent. Proposal, 400 Detrich St., Dayton, Ohio 45404 (513) 224-0851. The contract was signed by "John Pelloquin" without identification of a representative capacity. The contract contains a provision that "Workers' Compensation and Public Liability Insurance on above work to be taken out by NEW START DEMOLITION". Thus three names appear on the document for the contractor.
The contract provided that payments were to be made as follows: "$40,000 when 25% is completed; $40,000 when 50% is completed; $40,000 when 75% is completed; $60,000 when completed and passed final inspection". No means or method is set forth in the contract to objectively determine when a particular level of completion, percentage of completion, has taken place. Although there are various activities required to take place, such as removal of a fuel tank, removal of contaminated soil, pumping out and disposal of transformers and the like, as part of the general demolition and disposal of debris, no percentage of completion is related to any specific item of activity. There is no evidence to indicate any oral agreement or understanding between Eastern Company and the contractor as to an CT Page 1731 event or events which would thereby constitute a particular percentage of completion of the contract.
It was the responsibility of Mr. Whitmore on behalf of The Eastern Company to form an opinion as to percentages of completion as the work progressed. The contract does not give to either party the right to make a final or conclusive decision as to percentages of completion. Mr. Whitmore viewed his function in this ongoing decision making process as being on the basis of "a reasonable man", using a "reasonable estimate" as to the achievement of percentages of completion. He viewed the progress of the work from his own office window and did on occasion actually walk on the property.
On July 9, 1993 Eastern received an invoice from New Start Demolition Co., Inc. in the amount of $40,000 on the basis that 25% of the job had been completed. Eastern issued its check to New Start Demolition Co. on July 12 in the amount of $40,000. On July 14, 1993 Eastern received an invoice from New Start Demolition Co., Inc in the amount of $40,000 claiming that 50% of the job had been completed. Eastern paid this second installation of $40,000 by its check to New Start Demolition Co., Inc. on July 28. On August 12, 1993 New Start Demolition Co., Inc. sent a third invoice to Eastern, claiming that 75% of the job had now been completed. Mr. Whitmore felt that additional work had to be done to accomplish 75% completion. Consequently Eastern sent its check on August 27, 1993 for one-half of the invoice, twenty thousand dollars, payable to Nu-Start Demolition Co., Inc. On September 17, 1993 The Eastern Company sent its check for the second payment on the invoice of August 12, 1993 payable to New Start Demolition or John Pelloquin. Mr. Pelloquin had requested the check be made out in that fashion. Mr. Whitmore thought that Mr. Pelloquin and New Start Demolition were one and the same, and all of his dealings were with Mr. Pelloquin.
At this point there remained $60,000 to be paid on the contract, to be paid "when completed and passed final inspection". On December 19, 1993 an additional invoice was received requesting an additional payment of $20,000 as "partial payment on demo". The invoice requested payment be made to "NEW START DEMOLITION CO. or John Pelloquin". On December 20, 1993 The Eastern Company issued its check to "New Start Demolition Co., Inc. or John Pelloquin" per the instruction on the invoice, the check bearing the contract proposal address of 400 Detrich CT Page 1732 Street, Dayton, Ohio 45404, which is the same address that all the other checks had been issued to. This December 20, 1993 check is unquestionably an advance payment, as no part of the $60,000 balance was payable until the job was completed and passed final inspection.
At this point in time, December 20, 1993, there was one subcontractor or other person known to the defendant to have furnished materials or rendered services on the job. A company by the name of Phoenix Soil Treatment did some oil removal work at some point in time. It is not specified in the evidence exactly when that occurred, though best recollection of the defendant places that activity at approximately July 9, 1993. There is no reason to believe that "Phoenix" has, or is making, any claim of non-payment. By the time the plaintiff entered the project in February 1994, some additional demolition work, oil tank removal, compacting of holes, removal of debris and grading remained to be accomplished (Defendant's Exhibit 14).
The plaintiff Waterbury Landfill Associates is a partnership which is and has been in the business of debris removal since 1982. It is a partnership consisting principally of the brothers Bartholomew and Vincent LoRusso. In the fall of 1993 Vincent LoRusso became aware of the accumulation of debris on the subject property.
In January 1994 Vincent LoRusso telephoned Mr. Whitmore stating that they were interested in doing the debris removal work. They had previously done some work for Eastern. Mr. Whitmore informed Mr. LoRusso that Eastern already had the contract for the entire job and that Mr. LoRusso would have to take the matter up with Mr. Pelloquin.
On February 1, 1994 Waterbury Landfill Associates transmitted to "New Start Demolition, 400 Detrich Street, Dayton, OH 45404, Atten. Mr. Pelloquin", a detailed written proposal to do the debris rubbish removal work. Several days later Mr. Bart LoRusso received a call from Mr. Pelloquin agreeing to the plaintiff's proposal. The plaintiff commenced work on February 8, 1994 and continued the work until February 22, 1994. The plaintiff's invoice demonstrates that the total bill for this work is $34,859.70. The court determines that the amount charged was in accordance with the terms of the proposal. As between plaintiff and Mr. Pelloquin New Start Demolition Co., Inc., this agreement constituted a contract, proposal accepted CT Page 1733 verbally and by performance, and was in the nature of a requirement contract without a specified grand total contract price. The court has no reason to believe that the unit charges do not fall within the nebulous perimeter of the range of "fair and reasonable", through there is no evidence to indicate that the unit prices were the result of competitive bidding or comparative estimates. (The plaintiff has added onto the bill an amount of $2,091.58 for 6% CT TAX ON SERVICE — MATERIAL" which is not covered by the written proposal or by any evidence of modification of the contract).
When the plaintiff commenced work on February 8, 1994 all that was left to be done was in general some demolition and the debris removal. Most of the demolition work had been accomplished. There were several days of interruption in the work progress due to snow storms. On February 22, 1994 the work came to a halt. Bart LoRusso takes the position that they had done what Mr. Pelloquin had instructed them to do. In essence, that they were awaiting further instructions from Mr Pelloquin. Neither Eastern or Mr. Russo-Waterbury Landfill Associates were at that time able to locate Mr. Pelloquin.
A series of letters were exchanged. March 6, 1994 a letter from Waterbury Landfill to Eastern indicating legal action if their invoice to New Start was not paid. March 21 a response from Eastern reminding Waterbury Landfill that Eastern had no contract with Waterbury Landfill. March 22, a letter from Waterbury Landfill to Eastern informing that they had in essence been reminding Eastern of their mechanics Lien rights. Eastern invited Waterbury to bid on completing the job. Waterbury wanted to discuss both that prospect and the unpaid bill. Apparently nothing further came of that exchange.
By March 28, 1994 Mr. Pelloquin had surfaced, and apparently had sent a crew back on the job. However, by March 29 that work stopped, or may not have even gotten started. Eastern gave Mr. Pelloquin a mandate, by letter of March 30, that he had until April 4 to start the work. Nothing happened. On April 8, 1995, reciting Mr. Pelloquin's continuous ignoring of phone calls and letters, and no job activity, Eastern by letter, ordered "Mr. John Pelloquin, John Paul Ent./New Start Demolition Co., Inc." off the job because of this default in the contract.
Eastern had lost confidence in Mr. Pelloquin's ability or determination to complete the job. Mrs. Steve Sanelli, Vice CT Page 1734 President of Eastern had been given the task of locating a contractor to complete the job. He contacted three contractors. He received two bids. The lowest of the two bids was H.K.H. Ent., a partnership consisting of one Howard Gendron and Kenneth Omceke. Gendron had been working at one time with New Start, and hence was familiar with the project.
On August 8, 1994 Eastern contracted with HKH, Ent. to complete the entire job. Apparently there was still some standing concrete and brick walls left to be taken down and a 20,000 gallon fuel oil tank to be removed, and rough grading to be accomplished, filling and compacting of holes, as well as the general removal of debris. The total contract price was $66,500. The work was completed under the terms of the contract.
The contract price for the entire job with John Pelloquin/John Paul Ent./New Start Demolition Co., Inc. was $180,000.00. The defendant has paid $206,500 to have the contract work completed — $140,000 to the original contractor and $66,500 to H.K.H. ENT. to complete the job.
The work of the plaintiff on this project commenced on February 8, 1994 and ceased on February 22, 1994. On April 22, 1994 the plaintiff served upon the defendant The Eastern Company and upon New Start Demolition Company a "Notice of Intention to Claim a Mechanics Lien. On April 25, 1995 the plaintiff filed the mechanics lien at the Naugatuck Town Clerk's office and thereafter on that day, April 25, 1995, served the Eastern Company and New Start Demolition Co., Inc. with a copy of mechanics lien.
ISSUE A.
The defendant claims, by special defense that the plaintiff's claims are barred in whole or in part because (plaintiff's) claims did not arise from the consent of some person having authority from or rightfully acting for defendant The Eastern Company (the owner) in procuring labor and materials.
The plaintiff, however, seeks this lien as a subcontractor. The plaintiff is a subcontractor. General Statutes § 49-35(b) provides "No subcontractor . . . may be required to obtain an agreement with, or the consent of, the owner of the land, as provided in § 49-33 to enable him to claim a lien under this CT Page 1735 section."
 ". . . our law gives liens to two classes of subcontractors: (1) those who have an agreement with the contractor in writing and have the consent of the owner in writing and thus act with his knowledge and (2) those whose claims are not based upon any agreement with the owner. Those in the first class need give no notice, while those in the second class must do so within sixty days after their service has ceased."
New Haven Orphan Asylum v. Haggeraty Co., 108 Conn. 232, 240,241 (1928).
See also Purcell, Inc. v. Libbey, 111 Conn. 132, 136, 137
(1930).
The direct consent of the owner with the subcontractor is not necessary. The plaintiff has complied with the statutory prerequisites for claiming this mechanics lien.
ISSUE B.
The defendant contends that the plaintiff did not have a contract to do the work. The plaintiff's offer to the contractor was clear and detailed (see Exhibit A). The plaintiff performed the work in accordance with the terms of the written offer. The contractor verbally agreed to the terms of the proposal. The contractor accepted the work as it was occurring, through the contractor's representative signing the work ticket at the job site office as each load was removed, precisely as the contractor desired. The fact that the contract does not define the total amount (volume) of the work to be done, or a sum total of dollars for the eventual entirety of work to be done, in a total dollar summation, does not cause the arrangement to be something less than a contract. An as needed or as requested contract, a requirements contract, is enforceable to the same extent as would be a "total sum" or "total amount" contract. The contention that the plaintiff had no contract with the contractor is untenable. To the extent that the defendant's argument may be interpreted as implying that the services were rendered as a volunteer, in an gratuitous manner, such contention would certainly be unsupportable, as aforesaid. The amount covered by the asserted lien is $34,859.70. CT Page 1736
ISSUE C.
This issue arises out of General Statutes § 49-36(c). This section provides as follows:
 "In determining the amount to which any lien or liens may attach upon any land or building or lot or plot of land the owner of the land or building or lot or plot of land shall be allowed whatever payments he has made, in good faith, to the original contractor or contractors before receiving notice of the lien or liens. No payments made in advance of the time stipulated in the original contract may be considered as made in good faith, unless notice of intention to make the payments has been given in writing to each person known to have furnished materials or rendered services at least five days before the payment is made."
The defendant has pleaded as a special defense "plaintiff's claims are barred in whole or in part pursuant to C.G.S. § 49-36(c) to the extent of the defendant Eastern Company's good faith payments to its general contractor, reasonable cost of completion and damages".
In the context of this case the pleading of General Statutes § 49-36c must be understood in connection with § a of General Statutes § 49-36 which provides that no mechanics lien may attach to a greater amount in the whole, than the owner agrees to pay for the entire contract, here $180,000. This limitation is further set forth in General Statutes § 49-33(e). General Statutes § 49-33(f), though giving subcontractors subrogation rights of the general contractor, limits the amount of the potential lien by computing the sum of bona fide payments made plus cost of satisfactory completion plus damages for default.
As aforesaid, the defendant paid to the contractor $140,000 in installments. The defendant paid $66,500 for cost of completion. These sums exceed the contract price by $26,500.
The plaintiff has the burden of proving that the $140,000 payments were not made in good faith. See Cianelli v. Levy, 6 Conn. Cir. Ct. 507, 512; Hubbell, Hall Randall Co. v.CT Page 1737Pentecost, 89 Conn. 262, 268 (1915). The fact of the defendant having alleged both payment and good faith does not shift the burden of proof upon the defendant as concerns good faith. Undoubtedly the defendant must allege payment. Since the statute uses the phrase "payments he has made in good faith" that would appear to be the proper phrase to set the fact of payment before the court. This does not, however, change the burden of proof. The plaintiff's citation of Rawlinski v.Allstate Insurance Co., 165 Conn. 1 (1973) is inappropriate.
Regardless of who has the burden of proof, the conclusions on this issue are the same.
First, the second sentence of General Statutes § 49-36(c) states that advance payments are not made in good faith unless notice of intention to make the payments are given in writing to each person known to have furnished materials or rendered services at least five days before the payment is made. When the defendant made the admittedly advance payment of $20,000 on December 20, 1993, the plaintiff was not in the picture. The plaintiff's rendering of services did not commence until February 8, 1994, some fifty days subsequent thereto. The only other possible subcontractor that was on the job at some time was an entity by the name of "Phoenix" who did some oil removal work. Assuming from the evidence that the Phoenix work was done in July, 1993, six months before the advance payment, there is no indication that "Phoenix" has or has asserted any claim concerning this job. No claim is made in the briefs that the presence of "Phoenix" would trigger the five day notice provision of General Statutes § 49-36(c) for the benefit of the plaintiff. Such payment would be void against the claims of existing subcontractors, but not void against subsequent subcontractors. See Tice v. Moore, 82 Conn. 244, 249 (1909).
The question then settles upon whether the installment payments made to the contractor were made in good faith. The plaintiff argues to the court that the absence of an external or objective means; which it apparently claims must be specified by the terms of such a contract so as to objectively determine a percentage of completion, causes the payments to be not made in good faith. The court knows of no rule of law or universal practice of commerce or business which would mandate that an installment payment must be based upon, must include, a pre-determined objective measure for the establishing of percentages of completion. The parties are free to contract on an unspecified CT Page 1738 basis, leaving to their respective judgment conclusions as to percentage of completion as the job progresses. The court takes notice that on one of the payments, the August invoice, the defendant disagreed with the contractor as to percentage, and only half of the installment was paid at that time. This is how one would expect this type of arrangement to work when there is a dispute as to percentage of completion, in the absence of an objective measuring device.
The plaintiff suggests various mathematical calculations, based upon the Waterbury Landfill charges and the completion charges of H.K.E. Enterprises, to assert that the contract was less than 75% completed when the September 1993 payment was made to the contractor. The plaintiff seeks to impose a mathematical retrospective calculation by use of his own mathematical figures, which were not even available to the defendant when the payments were made. The court cannot superimpose upon the installments a method of calculation which is different than the reasonable viewing method utilized by the parties, so as to impose a method which is based on premises which presuppose mathematical logic, rather than common negotiable perceptive judgment, which was the method utilized by the contracting parties.
The statute C.G.S. § 49-36 allows to the owner, here the defendant, payments which were made "in good faith". As concerns the $140,000 of payments:
 "There was evidence neither of collusion with the general contractor designed to defeat the rights of the plaintiff, nor of misrepresentations by the defendant to the plaintiff to induce further performance than was financially warranted." Pine Dry Wall Co. v. Strawberry Hill Associates, 182 Conn. 568, 574
(1980).
 "Good faith in common usage has a well defined and generally understood meaning, being ordinarily used to describe that state of mind denoting honesty of purpose, freedom of intention to defraud, and generally speaking, means being faithful to one's duty or obligation. . . .An honest intention to abstain from taking an unconscientious advantage of another . . ." Phillips v. Thomas, 3 Conn. App. 471, 474 (1985). CT Page 1739
The court finds that each of the installment payments made by the defendant were made in good faith. The facts ". . . do not demonstrate a lack of good faith." Pine Dry Wall Co. v.Strawberry Hill Associates, supra, p. 574.
ISSUE D.
The plaintiff takes the position that the defendant has failed to prove that the cost to complete the work on the contract, $66,500, was reasonable. The defendant is entitled to a credit for the reasonable cost of completion of the contract (General Statutes § 49-33(f). The subsequent completion contract with H.K.H. ENT. required work in addition to debris removal, including some demolition work. The contract was the result of the seeking of bids or proposals, and acceptance of the lowest proposal. The work was accomplished in accordance with the terms of the completion contract.
Much of the completion work accomplished was within the particular expertise of the plaintiff, who has been in the business of debris removal for many years, and whose partners were in actual attendance and who testified during the course of this trial. The court draws the inference, from the fact of the competitive estimate process, which was here utilized by the defendant's officer Mr. Sanelli, who was familiar with the bidding process for other types of work, and the fact that the work was properly and was satisfactorily accomplished, that the cost of completion was in fact reasonable for the work involved and satisfactorily performed. The plaintiff having been given ample opportunity and yet failing to produce any evidence concerning this subject, bearing in mind the particular expertise of the plaintiff, does not lend great credibility to the plaintiff's contention that the court should not draw the inference of reasonableness from the evidence produced by the defendant. The cost of completion, $66,500 was a reasonable cost for the work of completion.
Finally, even if the court were to have concluded that the December 19, 1993 advance payment of $20,000 was not made "in good faith" yet the cost of completion, $66,500 when added to the earlier payments of $120,000 amounts to $186,500. This amount would be $6,500 in excess of the contract price of $180,000. The defendant's actual payments are now $26,500 in excess of the contract price. Although parts of the mechanics lien statutes are designed for the reasonable protection of CT Page 1740 subcontractors, the statutes have neither the purpose, nor the intent, nor the effect of imposing upon the owner, acting in good faith, the irrational result of having to pay over $240,000 for the performance of a $180,000 contract.
For the reasons set forth herein, the court enters judgment for the defendants in this action.
L. PAUL SULLIVAN, J.